## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**ELBERT LEROY DAGE,**                  )
                                        )
                    **Plaintiff,**      )
                                        )        **Civil Action No. 04-0221 (JDB)**
         **v.**                         )
                                        )
**STEPHEN JOHNSON,**                    )
                                        )
         **Administrator,**             )
         **U.S. Environmental**         )
         **Protection Agency,**         )
                                        )
                    **Defendant.**      )
_____)

## <u>MEMORANDUM OPINION</u>

Plaintiff Elbert Leroy Dage is an environmental scientist and a thirty-year veteran of the U.S. Environmental Protection Agency. He is also permanently disabled. Dage brought this action against the EPA alleging discrimination and retaliation on the basis of disability in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 791 *et seq.* On January 9, 2007, the Court entered judgment against Dage finding that he failed to administratively exhaust many of his claims and that for the remaining claims that were exhausted, he did not establish he had been subject to an adverse employment action, an essential element of his case. This matter is before the Court on Dage's motion to alter or amend judgment pursuant to Federal Rule of Civil Procedure 59(e). For the reasons explained below, the motion will be denied.

1

**BACKGROUND**

The Court presumes familiarity with the operative facts detailed in its initial opinion. *See*

*Dage v. Leavitt*, 2007 U.S. Dist. LEXIS 925 (D.D.C. 2007) (Penn, J.). Hence, only an abbreviated

summary of facts pertaining to the motion for reconsideration is provided here.

**I.     Factual Summary**

Dage holds a masters degree in civil engineering and is an environmental scientist in the

Office of Prevention, Pesticides and Toxic Substances (OPPTS) at the U.S. Environmental

Protection Agency. Compl. ¶ 11. He joined the EPA in 1975 at grade 7 and was elevated to grade

13 in 1980, the position he holds today. *Id*. ¶¶ 11-12.

Dage is disabled. *Id*. ¶ 15; Answer ¶ 31. He has Chronic Obstructive Pulmonary Disease

(COPD) and suffers from severe asthma and allergies. Compl. ¶¶ 27-28, 30. He has a history of

anaphylaxis,[1] bronchitis and upper respiratory infections. *Id*. ¶ 30. His allergy symptoms are

numerous and severe and include coughing, watery eyes, sinus irritation, drowsiness, repetitive

sneezing, difficulty breathing, dermatitis, rashes, redness of the skin, itching, fatigue, eye irritation,

headaches, hives, runny nose, throat irritation, itching of the ears, and bronchitis. *Id*. ¶ 27. Given

the severity of his symptoms, Dage avoids "numerous environmental triggers," such as dust, mold,

pollen, organic solvents, printing inks, paints, kerosene, turpentine, oil, gasoline, asphalt fumes,

perfumes and colognes, air fresheners, moth balls, air pollution, vehicle exhaust, smoke, hot air, cold

air, and exercise. *Id*. ¶ 28. Dage's disability is permanent and affects his ability to "breathe

---

[1] Anaphylaxis is a severe allergic reaction that causes Dage's airway to "constrict and close completely and become plugged with mucous." Compl. ¶ 25.

normally," which limits his ability "to perform . . . major life activities, such as sleeping, running, bicycling, walking extended distances, climbing stairs, and working." *Id.* ¶¶ 15, 31.

Dage claims that he and other EPA employees were injured and became disabled when they were exposed to "chemicals and toxins" at EPA's Waterside Mall office building (Waterside Mall) in the 1980's. Compl. ¶ 15. Dage first experienced severe allergy symptoms in 1985 while working in his EPA office at Waterside Mall. *Id.* ¶ 16. In 1988 and 1989 he experienced numerous episodes of upper respiratory infections and worsening allergy and asthma symptoms. *Id.* ¶ 17. He sought the advice of several medical professionals during the time, including medical doctors in the EPA's health unit. *Id.* ¶¶ 18-19. On June 11, 1990, Dage reported to the EPA health unit after experiencing an asthma attack. Two days later, a doctor in the health unit evaluated Dage and recommended that he participate in the EPA's Alternative Work Space program (AWS). The AWS program allowed EPA "employees to perform work from either their home using telephone and computer equipment or from a specially equipped EPA office space designed to minimize potential exposure to chemicals, allergens, and indoor air pollution." *Id.* ¶ 20. After several requests, *see id.* ¶¶ 21-23, Dage was temporarily relocated to an AWS office at the EPA's Crystal Station complex, *id.* ¶¶ 23, 39. This reassignment was made permanent in 1993 and Dage remained in the Crystal Station AWS office until 2003, when he was reassigned to work from home. *Id.* ¶ 39. Dage has not been removed from the AWS program or reassigned back to Waterside Mall.

The EPA modified the AWS policy on February 1, 1999 (1999 AWS policy). Compl. ¶ 46. Under the new 1999 AWS policy, each employee had "to notify their immediate supervisor of his/her AWS status within 30 days." *Id.* ¶ 48. Employees who did not notify their supervisor as instructed

faced "automatic revocation of his [or her] AWS status and accommodations." *Id*. After notifying their supervisors, employees had "to submit new applications and new medical documentation within six months in order to retain [AWS status]." *Id*. ¶ 49. There were two additional substantive changes to the policy that are relevant here. First, the EPA took the position under the 1999 AWS policy "that reasonable accommodations under the Rehabilitation Act and reasonable accommodations under the AWS policy [were] separate." *Id*. ¶ 47. Second, under the 1999 AWS policy employees had to renew their enrollment in the program every two years. Specifically, an employee desiring to remain in the AWS program had to prepare and submit a renewal application every other year. As part of this renewal application, the employee had to consult a physician who could document the employee's medical condition and need for AWS workspace. *Id*. The prior AWS policy did not contain a re-certification requirement.

In keeping with the new policy, Dage notified his immediate supervisor, Jennifer Seed, that he was in the AWS program in early 1999, *id*. ¶ 48, and submitted an application to remain in the program later that year, *id*. ¶ 51. To comply with the certification requirement, Dage consulted a physician, which required him to use sick leave and incur "medical and other expenses."[2] *Id*. ¶ 52. Dage claims the new certification requirement subjected him to the "stress and fear" that he might lose his status as an AWS employee. *Id*. ¶ 56. Dage faced this same stress and fear and incurred medical expenses two years later, in 2001, when he submitted his renewal application. *Id*. ¶ 54.[3]

---

[2] Dage does not indicate how much sick time he had to use to see a physician or the amount of money he spent doing so.

[3] When Dage prepared his renewal application in 2001, his personal physician recommended that he remain in Crystal Station for the duration of his employment with the EPA.

## II.      Procedural Summary

Dage sought informal counseling with an EPA counselor on March 17, 1999, only a few weeks after the EPA implemented the new AWS policy.  Compl. ¶ 3.  After counseling, Dage filed a formal administrative complaint with the EPA's Office of Civil Rights on September 2, 1999.  *Id*.  *See generally* Def.'s Mot., Ex. 1, September 2, 1999 Complaint of Discrimination in the Federal Government (EEO Compl.).   In his EEO complaint, Dage alleged the 1999 AWS policy was retaliatory and discriminatory.  The new policy was retaliatory, he claimed, because it only applied to employees, like Dage, who had been injured at Waterside Mall and had "sent a letter to the [EPA] Administrator on January 2, 1999, advising her of [their] concerns and requesting a meeting as to the new AWS policy."  EEO Compl. ¶¶ 3, 13.  Dage explained that the policy's re-certification requirement, required every other year, was overly burdensome and was  "intended as retaliation" for speaking out against the policy.  *Id*. ¶ 16.  Furthermore, the new AWS policy was discriminatory, he claimed, because it would "have a disparate impact on one particular group of disabled employees" – those employees who were injured at Waterside Mall.  *Id*. ¶ 16.  Dage complained that AWS employees were subject to "repeated medical testing," while employees who were not in the AWS program, or were in EPA's regular flexiplace program, were not.  *Id*.

On February 12, 2004, Dage filed this action against the EPA, asserting the following claims:  first, that the EPA had failed to recognize that Dage was disabled within the meaning of the Rehabilitation Act (Claim I); second, that the EPA failed to make several reasonable

---

Compl. ¶ 55.  The physician noted Dage did "not need to be re-evaluated unless [he] experienced significant symptoms which required additional measures."  *Id*.

accommodations of Dage's disability (Claim II); third, that the EPA had intentionally discriminated against Dage due to his disability when it implemented the 1999 AWS policy (Claim III); and fourth, that the EPA retaliated against Dage by implementing and applying the new AWS policy against Dage and other employees who had been injured at Waterside Mall (Claim IV). Compl. ¶¶ 86-106. Dage's civil complaint also contained several allegations that he had faced discrimination and retaliation after the new policy was implemented, which the parties commonly refer to as his post-1999 allegations.

On December 8, 2005, the defendant filed a motion for judgment on the pleadings or, in the alternative, for summary judgment, which Judge John Garrett Penn of this Court granted in full. Dage filed the present motion to alter or amend judgment under Fed. R. Civ. P. 59(e) on January 24, 2007. The case was reassigned to the undersigned judge for consideration of Dage's Rule 59(e) motion on January 7, 2008.

## STANDARDS OF REVIEW

### I.    Motion to Alter or Amend Judgment

A motion to alter or amend judgment under Rule 59(e) "is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam) (internal quotation marks and citation omitted); *accord Ciralsky v. CIA*, 355 F.3d 661, 671 (D.C. Cir. 2004). A Rule 59(e) motion is generally disfavored, and is reserved for "extraordinary circumstances," *Niedermeier v. Office of Max S. Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C. 2001); it is not an opportunity for an

unhappy litigant "to reargue facts and theories upon which a court has already ruled," *New York v. United States*, 880 F. Supp. 37, 38 (D.D.C. 1995), or "a vehicle for presenting theories or arguments that could have been advanced earlier," *Burlington Ins. Co. v. Okie Dokie, Inc.*, 439 F. Supp. 2d 124, 128 (D.D.C. 2006) (citing *Kattan v. Dist. of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993)); *see also Independent Petroleum Ass'n of Am. v. Babbitt*, 178 F.R.D. 323, 324 (D.D.C. 1998) ("Rule 59(e) motions are not to be used to relitigate matters already argued and disposed of; they are intended to permit the court to correct errors of fact appearing on the face of the record, or errors of law.").  The burden is on the movant, Dage, to demonstrate "new facts or a clear error of law which 'compel' a change in the court's ruling."  *New York*, 880 F. Supp. at 39 (quoting *Natural Resources Defense Council. Inc. v. U.S. Environmental Protection Agency*, 705 F. Supp. 698, 702 (D.D.C. 1989), *vacated on other grounds*, 707 F. Supp. 3 (D.D.C. 1989)).

        In addressing Dage's claims in his motion, then, this Court will follow this narrow Rule 59(e) standard.  Hence, although the underlying decision challenged by Dage was issued by a different judge, this Court will not examine Dage's claims *de novo*, but rather will employ the deferential Rule 59(e) standard.  Nor, of course, would it be appropriate for this Court to undertake what would amount to appellate review of the January 9, 2007 decision granting judgment in favor of defendant.  But in addressing Dage's claims on reconsideration, this Court is free to expand on the reasons supporting the entry of judgment for defendant, and indeed will do so below.

## II.    The *McDonnell Douglas* Framework

        Dage claims discrimination and retaliation under Title VII and the Rehabilitation Act. Title VII makes is unlawful for a federal government employer to discriminate "based on race, color,

religion, sex, or national origin." 42 U.S.C. § 2000e-16(a).  The Rehabilitation Act provides that "no otherwise qualified individual with a disability" may be discriminated against by a federal agency "solely by reason of her or his disability."  29 U.S.C. § 794(a).  Section 501 of the Act further mandates that federal agencies take affirmative steps to provide for qualified persons with disabilities.  29 U.S.C. § 791; *Carr v. Reno*, 23 F.3d 525, 528 (D.C. Cir. 1994); *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 (D.D.C. 2002).

Where there is no direct evidence of discrimination, the Court applies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination.  Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the [action in question]."  Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802).[4]

In most cases, to make out a *prima facie* case of disparate-treatment discrimination, a plaintiff must demonstrate that: (1) he or she is a member of a protected class; (2) he or she has

---

[4] Disability discrimination claims brought under the Rehabilitation Act are subject to the same *McDonnell Douglas* burden-shifting standard as Title VII claims.  *Bolden v. Ashcroft*, 515 F. Supp. 2d 127, 131 n.2 (D.D.C. 2007).  The Rehabilitation Act, however, incorporates the standards of the Americans with Disabilities Act (ADA) in determining whether employment discrimination has occurred.  *Carroll v. England*, 321 F. Supp. 2d 58, 69 n.7 (D.D.C. 2004).  A *prima facie* case of discrimination under the ADA requires plaintiff to show that he or she: (1) had a disability; (2) was qualified for the position with or without a reasonable accommodation; and (3) suffered an adverse employment action because of the disability.  *Swanks v. Washington Metro. Area Transit Auth.*, 179 F.3d 929, 934 (D.C. Cir. 1999).

suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007); *Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002). The *prima facie* requirements are slightly different for a retaliation claim, as the plaintiff must show: (1) that he or she engaged in a statutorily protected activity; (2) the employer took an adverse personnel action; and (3) that a causal connection existed between the two. *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999) (citing *Mitchell v. Baldrige*, 759 F.2d 80, 84 (D.C. Cir. 1985)). "A common element required for discrimination and retaliation claims against federal employers . . . is . . . [an] adverse action by the employer." *Id*. at 453.

## DISCUSSION

Although Dage contends that there are several errors in the January 2007 opinion, he is essentially challenging two aspects of the analysis. First, Dage challenges the decision to dismiss claims II, III, and IV to the extent these claims encompass allegations that post-date the 1999 AWS policy. Second, Dage challenges the conclusion that the EPA's implementation of the 1999 AWS policy did not, as a matter of law, constitute discrimination or retaliation because it did not amount to an adverse employment action. The Court will examine each challenge in turn.[5]

### I.    Allegations Post-Dating the 1999 AWS Policy

Claims II, III and IV of Dage's civil complaint are each based to a varying degree on conduct that allegedly occurred after the EPA implemented the 1999 AWS policy. In claim II, Dage alleged he was denied four discrete reasonable accommodations: (1) reliable telecommunications equipment,

---

[5]  Dage does not seek reconsideration with respect to his allegations that pre-date the 1999 AWS policy, *see* Plt.'s Mot. at 27 n.9, or the decision to dismiss claim I of his Complaint, *id*. at 1 n.2.

which would have allowed him attend team meetings remotely, science forums, and workgroups, *see* Compl. ¶¶ 78- 80; (2) portable work, which would have allowed him to continue working with his team from an offsite location, such as his home, *id*. ¶¶ 63, 77; (3) adequate computer equipment and office supplies, which would have allowed him to work remotely, *id*. ¶¶ 81-83; and (4) a mobility scooter, which would have allowed him to travel to a third EPA location when necessary, *id*. ¶ 85. Dage alleged in claim III that he was discriminated against when the EPA: (1) took all substantive work away from him, unless he agreed to forfeit his AWS workspace, *id*. at ¶¶ 58-59, 70-72; (2) denied him a fair opportunity to compete for promotion, *id*. ¶¶ 73-75; and (3) insinuated (through Ms. Seed, Dage's supervisor) that he did not suffer a disability under applicable EEOC rulings, *id*. at ¶ 84. And in claim IV, Dage alleged he was subjected to retaliation based on several of the same allegations contained in claims II and III, *e.g.*, denial of professional work and promotions.

The Court entered judgment against Dage on all three claims in its January 2007 decision. It concluded that Dage had failed in his statement of material facts in dispute to controvert the "EPA's explanations" with regard to several post-1999 allegations. The Court found, specifically, that Dage had failed adequately to address the allegations concerning reliable telecommunications equipment, loss of substantive work, and denial of promotion. The Court therefore treated these three matters as conceded pursuant to Local Rule 7(h) and adopted the EPA's explanations provided in its answer – but not in its statement of material facts not in dispute – for purposes of ruling on the motion for summary judgment. *See Dage*, 2007 U.S. Dist. LEXIS 925 at *24 ("Dage has not addressed or disputed the EPA's explanations regarding the preceding assertions within his Statement of Material Facts or other such pleadings. . . . Therefore, the Court treats [them] as

concessions.").   With regard to three of Dage's accommodation requests -- mobility scooter, computer equipment, and telecommunications equipment needed to attend the science forum -- the Court concluded that the requested accommodations were not "necessary for Dage to perform his job" and therefore were not "reasonable" accommodations.  *Id*. at *25-26.  The Court also noted, in passing, that even if these requests were reasonable it was "quite clear" Dage had not "first administratively exhausted" them.  *Id*. at *26 ("In any event, assuming *arguendo* that the Court were to consider the forgoing accommodation requests as necessary for Dage to perform his job, it is also quite clear that they were not first exhausted administratively.").[6]

In his Rule 59(e) motion, Dage asks this Court to correct two errors in the analysis.  First, he claims the Court committed clear error when it concluded that he had failed to address and therefore admitted the EPA's explanations.  He argues that in fact he did "controvert" the EPA's explanations as required by Local Rule 7(h) in his statement of material facts in dispute, and that it was therefore wrong for the Court to accept and adopt the EPA's explanations.  Second, Dage claims the Court committed clear error when it concluded his post-1999 allegations in claims II, III and IV were not encompassed by his administrative complaint and consequently were not exhausted.  This Court is not swayed by either argument.

A.       Summary Judgment & Local Rule 7(h)

Dage claims the Court committed clear error when it concluded that he failed to address his post-1999 allegations in his statement of material facts.  *See* LCvR 7(h).  In response to Dage's Rule

_____

[6] The Court's opinion neglected to address Dage's supervisor's allegedly disparaging comments.  As explained *infra*, this claim was not properly exhausted.

11

59(e) motion, this Court reviewed the January 2007 opinion and, in candor, found it deficient.  The Court erred then when it stated without elaboration that Dage had "not addressed or disputed" the EPA's explanations "within his Statement of Material Facts or other such pleadings" and that he had by default "conceded" these points.  *Dage*, 2007 U.S. Dist. LEXIS 925 at *24.  Even a cursory reading of his statement shows Dage addressed the post-1999 allegations.  *See* Pl.'s Statement of Material Facts as to Which There Is a Genuine Dispute ¶¶ 8-14.  This plain error, however, does not require alteration or vacation of the earlier opinion because summary judgment for defendant was nonetheless proper.

Summary judgment should be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits or declarations show there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (material facts are "facts that might affect the outcome of the suit under the governing law").  The party opposing the motion on the ground that there are material facts in dispute must set forth the specific facts showing there is a genuine issue for trial.  Fed. R. Civ. P 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.") (quotation marks omitted).

In this Court, the party opposing a motion for summary judgment must also comply with Local Rule 7(h).[7]  *Sec. & Exchange Comm'n v. Banner Fund Int'l*, 211 F.3d 602, 615 (D.C. Cir.

---

[7] Local Rule 7(h), formerly Local Rule 7.1(h), is identical to Local Rule 56.1.

2000).  That rule requires the nonmovant to attach a statement of material facts as to which the party

contends there is a genuine issue for trial, with specific citations to those portions of the record upon

which the party relies in fashioning the statement.  LCvR 7(h) ("An opposition to [a motion for

summary judgment] shall be accompanied by a separate concise statement of genuine issues setting

forth all material facts as to which it is contended there exists a genuine issue necessary to be

litigated, which shall include references to the parts of the record relied on to support the

statement."); *see also Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145,

151 (D.C. Cir. 1996) (noting local rule "places the burden on the parties and their counsel, who are

most familiar with the litigation and the record, to crystallize for the district court the material facts

and relevant portions of the record.") (citations omitted).

   If the nonmovant "fails to comply with this local rule, then 'the district court is under no

obligation to sift through the record' and should 'instead … deem as admitted the moving party's

facts that are uncontroverted by the nonmoving party's Rule [7(h)] statement.'"  *Banner Fund*, 211

F.3d at 616 (quoting *Jackson*, 101 F.3d at 154); s*ee also* LCvR 7(h) ("In determining a motion for

summary judgment, the Court may assume that facts identified by the moving party in its statement

of material facts are admitted, unless such a fact is controverted in the statement of genuine issues

filed in opposition to the motion."); *Arrington v. United States*, 473 F.3d 329, 335 (D.C. Cir. 2006)

(noting local rule is permissive, not mandatory, and the district court is given discretion to deem

uncontroverted facts admitted).  The courts in this circuit demand "strict compliance" with Local

Rule 7(h), which "is justified both by the nature of summary judgment and by the rule's purposes."

*Gardels v. Central Intelligence Agency*, 637 F.2d 770, 773 (D.C. Cir. 1980).  A nonmovant's "failure

to file a proper Rule [7(h)] Statement in . . . opposing a motion for summary judgment may be fatal to the delinquent party's position." *Id.* at 773 (citations omitted).

Here, Dage failed to comply with both Local Rule 7(h) and Federal Rule of Civil Procedure 56(e). Although Dage filed a Rule 7(h) statement, which ostensibly comported with the requirement that he "include references to the parts of the record relied on [in] support" of his statement, he did not cite to record evidence for his post-1999 allegations. Rather than cite to actual evidence in the record, such as an affidavit or deposition, Dage cited to his complaint -- repeatedly. *See* Pl.'s Stmt. of Facts ¶¶ 8-16. In one emblematic paragraph, Dage attempted to show that there was a material question of fact regarding whether he was denied adequate telecommunications equipment:

> Plaintiff contends that defendant has failed to provide reasonable accommodations for him to participate in meetings by teleconference. Complaint, para. 80. Defendant claims that it has attempted to provide the accommodations but there have been "occasional unanticipated glitche[es]." Answer, para. 80.

*See* Pl.'s Stmt. of Facts ¶ 13. All Dage did here, however, was couple a factual assertion from his complaint, unsupported by record evidence, with a contradictory factual assertion from the answer. This gives the illusion that there was a genuine issue for trial. Upon closer inspection, however, there is no evidence, at least none that Dage has cited or the Court has found, that he was deprived of telecommunications equipment. His other post-1999 allegations almost always follow the same pattern -- an attempt to manufacture factual disputes by juxtaposing his complaint with defendant's answer.[8] Hence, the Court did not err in the January 2007 decision when it concluded that Dage's statement did not satisfy Local Rule 7(h). *See Gardels*, 637 F.2d at 773 (noting purpose of local rule

---

[8] In only one of this series of paragraphs regarding his post-1999 claims does Dage cite to something other than the complaint or answer. *See* Pl.'s Stmt. of Facts ¶ 8.

is to "isolate[] the facts that the parties assert are material, distinguish[] disputed from undisputed facts, and identif[y] the pertinent parts of the record").

The Court did err elsewhere however.  Under the local rule, the Court was authorized to "assume that facts identified by the [defendant] in its <u>statement of material facts</u> are admitted." LCvR 7(h) (emphasis added). However, instead of assuming facts identified by the defendant in its statement of material facts, which would have been proper, the Court looked to defendant's <u>answer</u>. The "explanations" the Court deemed to have been admitted were therefore taken directly from the answer, not the statement of material facts.  This was a misapplication of Local Rule 7(h) because courts are not authorized by the rule to assume unsupported factual allegations in the answer are admitted.  Although the Court admittedly overstepped its authority under the local rule, however, this does not amount to error that this Court "need[s] to correct," *Firestone*, 76 F.3d at 1208, because summary judgment against Dage was proper with or without accepting the EPA's explanations.

The decision to enter judgment on Dage's claims to the extent they were predicated on post-1999 allegations was, on this slim record, correct.  Rule 56(e) required Dage to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  Dage did not do this – as noted above, he simply cited to his complaint.  He did not satisfy Rule 56(e) or establish that there was a genuine issue for trial regarding his post-1999 allegations because he did not "provide evidence that would permit a reasonable jury to find" in his favor.  *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  To defeat summary judgment, Dage had to produce more than "a scintilla

15

of evidence to support his claims." *Freedman v. MCI Telcomms. Corp.*, 255 F.3d 840, 845 (D.C. Cir. 2001) (citing *Anderson*, 477 U.S. at 252).  By citing only to his complaint, however, Dage eschewed his obligations under Rule 56 and exposed why his statement of material facts contained no citations to the record – because there was no evidence in the record to which he could cite.  *See, e.g.*, *Tarpley v. Greene*, 684 F.2d 1, 7 (D.C. Cir. 1982) (noting nonmovant failed to comply with Rule 56(e) and the local rule when he failed, *inter alia*, to "cite any record evidence, relying instead on the complaint itself" and "did not set forth specific, material facts, but simply asserted, without citing evidence in the record, that there was a disputed issue").

"Under *Celotex*, a court must enter summary judgment against a nonmovant 'who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1032 (D.C. Cir. 1988) (quoting *Celotex Corp.*, 477 U.S. at 322).  This is what the Court must do here.  Judgment against Dage is warranted because he presented no evidence that would support his post-1999 allegations.  In fact, in only one paragraph in his statement of material facts relevant to the post-1999 allegations did Dage cite to something other than his complaint.  *See* Pl.'s Stmt. of Facts  ¶ 8.  Specifically, in paragraph eight he cited to an email he sent his supervisor as evidence that the EPA "took all professional substantive work away from [him] until [he] moved out of the AWS office."  *Id*. ¶ 8.  In the email, Dage wrote to "confirm" his understanding that he would not receive "any new assignments as long as [he was] stationed in the AWS [workspace]."  Pl.'s Opp'n, Ex. 9.  He also noted that he was "no longer responsible for [] two projects" on which he had been working.  *Id*.  While this email represents the type of evidentiary support generally lacking from the

record, this single email, by itself a mere scintilla of evidence, is not enough to defeat summary judgment. *Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003) ("A party opposing a motion for summary judgment must point to more than just 'a scintilla of evidence' supporting [his or her] position; 'there must be evidence on which the jury could reasonably find for the plaintiff.'") (quoting *Anderson*, 477 U.S. at 252).

Tellingly, Dage does not contend in his motion for reconsideration that the Court overlooked relevant record evidence or that he could have added additional factual citations to his statement if given the opportunity to do so. He does not, in other words, explain how he could meet his burden with respect to the post-1999 allegations. Although he asks for reconsideration, he does not explain how he could survive the motion for summary judgment. *See Bolden v. Ashcroft*, 515 F. Supp. 2d 127, 130 (D.D.C. 2007) ("Although summary judgment 'must be approached with specific caution in discrimination cases, a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial.'" (quoting *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001), *aff'd*, 328 F.3d 647 (D.C. Cir. 2003)). But without directing the Court to evidence in the record, Dage has not shown that there is a genuine issue for trial regarding his post-1999 allegations.

Dage instead asks for more time. He apparently recognizes that the current record contains a paucity of facts or evidence that would support his post-1999 allegations, for he asks the Court – for the first time in his reply brief – to give him additional time for discovery. Dage explains, with respect to his statement of material facts, that his "citation to [the] Complaint and defendant's Answer was the best [he] could do" "[i]n these circumstances" because he "was not given an

17

opportunity for discovery." Pl.'s Reply Br. at 11. "It would be extremely unfair to require record evidence," he asserts, because he has "not had the opportunity to obtain it and defendant's motion was a deliberate effort to prevent discovery to which [he] was entitled." *Id*. at 11-12. This Court is not swayed by his late request.

Dage is correct that "a party opposing summary judgment needs a 'reasonable opportunity' to complete discovery before responding to a summary judgment motion and that 'insufficient time or opportunity to engage in discovery' is cause to defer decision on the motion." *Azhar Ali Khan v. Parsons Global Servs., Ltd.*, 428 F.3d 1079, 1087 (D.C. Cir. 2005) (quoting *Martin v. Malhoyt*, 830 F.2d 237, 256 (D.C. Cir. 1987)). Summary judgment is appropriate only if both parties have "had a full opportunity to conduct discovery," *Anderson*, 477 U.S. at 257, and is "disfavored when additional development of facts might illuminate the issues of law requiring decision." *Nixon v. Freeman*, 670 F.2d 346, 362 (D.C. Cir. 1982); *see also Breen v. Peters*, 474 F. Supp. 2d 1, 7 (D.D.C. 2007) ("Summary judgment is premised on the notion that parties will have had 'adequate time for discovery' to establish whether a genuine issue of material facts exists." (quoting *Celotex*, 477 U.S. at 322)). Here, however, for three reasons Dage has not established that additional discovery is warranted.

First, Dage does not identify the discovery he needs to oppose defendant's motion for summary judgment. He does not, for example, identify a deponent he has yet to depose, or specify a document in defendant's possession, which would allow him adequately to oppose the motion for summary judgment. This lapse in detail is important given that Dage has already conducted some discovery, including taking the deposition of his direct supervisor, Ms. Seed, who allegedly played

an integral role in the EPA's post-1999 discrimination.  If Dage needed additional discovery he should, in response to a summary judgment motion or certainly now at this point of the litigation, be able to identify specifically what information in defendant's control is needed.  But he is silent on this point.

Second, a motion for reconsideration is not a proper vehicle for requesting additional discovery.  *Kattan*, 995 F.2d at 276 ("[A] losing party may not use a Rule 59 motion to raise new issues that could [and should] have been raised previously.").  If Dage needed additional discovery to respond to the motion for summary judgment, as he now claims, he should have made this point in his opposition brief.  *See* Fed. R. Civ. P. 56(f).  But Dage did not make it in his opposition brief; nor did he make it in his motion for reconsideration.  Instead, Dage raised this argument for the first time in his reply brief.  The Court is under no obligation to entertain arguments raised for the first time in a reply brief on a motion for reconsideration.  *See McBride v. Merrell Dow & Pharmaceuticals*, 800 F.2d 1208, 1210 (D.C. Cir. 1986) ("[Courts] generally will not entertain arguments omitted from [a party's] opening brief and raised initially in his [or her] reply brief.").  Although Dage previously did argue in favor of additional discovery, he did not contend, until now, that he needed discovery to respond to the motion for summary judgment.  Rather, his argument was pragmatic -- he saw no reason to stay discovery because he thought it was "extremely unlikely" his case would be dismissed in its entirety.  *See* Pl.'s Motion Stay Discovery on Pl.'s Mental Health Information at 11 (no reason to stay all discovery as "it is extremely unlikely that the entire case will be dismissed").

Finally, Dage is not entitled to additional discovery because it would be futile – his post-1999

19

allegations were not administratively exhausted.  It is to that issue that the Court now turns.

## B.    Administrative Exhaustion[9]

Dage claims the Court committed clear error when it concluded his post-1999 allegations were not encompassed by his administrative complaint.  *See* Dage Reply Br. at 1.  He argues, primarily, that the scope of his EEO complaint was broad enough to encompass his post-1999 allegations.   Alternatively, Dage contends that even if his post-1999 allegations "were not encompassed in [his] administrative complaint, there is substantial authority that acts of retaliation occurring after the filing of an administrative complaint can be included in a judicial complaint without the need to file a new administrative complaint."  Dage Mot. at 22.  Because the exhaustion issue was not addressed in detail in the January 2007 decision, the Court will do so here.

### 1.    Legal Standard for Exhaustion of Administrative Remedies

A federal employee alleging discrimination in violation of Title VII or section 501 of the Rehabilitation Act is required to timely exhaust his or her administrative remedies.  *Harris v. Gonzales*, 488 F.3d 442, 443 (D.C. Cir. 2007); *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997); *Thorne v. Cavazos*, 744 F. Supp. 348, 350 (D.D.C. 1990).  Failure to do so will ordinarily bar a judicial remedy.  *See Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985) (noting initial burden of establishing a failure to exhaust administrative remedies rests with the defendant); *see also Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 68 (D.D.C. 2007) ("Dismissal results when a plaintiff fails

---

[9]  For all the space and attention Local Rule 7(h) has received here, the chief reason the Court will not alter the original judgment is that Dage's post-1999 allegations were not administratively exhausted.

to exhaust administrative remedies.").

The employee is first required to contact an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1).  Should the matter remain unresolved after informal counseling, the employee may file a formal discrimination complaint with the agency. *Bowie v. Ashcroft*, 283 F. Supp. 2d 25, 33 (D.D.C. 2003).  A formal complaint filed with the agency must contain a statement by the employee that is "sufficiently precise to identify the aggrieved individual and the agency and to describe generally the action(s) or practice(s) that form the basis of the complaint." 29 C.F.R. §1614.106(c).  The employee is free to amend the "complaint at any time prior to the conclusion of the investigation to include issues or claims like or related to those raised in the complaint." *Id*. §1614.106(d).

If the employee is dissatisfied with the final disposition of the complaint, he or she may file a civil action within 30 days of receipt of the notice of final action by the agency. *Bowie*, 283 F. Supp. 2d at 33 (citing 42 U.S.C. § 2000e-16(c)).  A civil action filed in federal court is limited in scope by the underlying administrative complaint.  A claimant may only litigate those allegations that were contained in the EEO complaint or those that are "like or reasonably related to the allegations of the charge." *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995); *see also Lane v. Hilbert*, 2004 U.S. App. LEXIS 9397 (D.C. Cir. May 12, 2004) (noting the breadth of a civil suit is "only as broad as [the] scope of any investigation that reasonably could have been expected to result from [the] initial charge of discrimination"); *Lewis v. Dist. of Columbia*, 2008 U.S. Dist. LEXIS 4571, *10 (D.D.C. 2008) ("In actions brought under Title VII, a court has authority over only

those claims that are (1) contained in the plaintiff's administrative complaint or claims 'like or reasonably related to' those claims in the administrative complaint and (2) claims for which the plaintiff exhausted administrative remedies.") (quoting *Park*, 71 F.3d at 907 ); *Cannon v. Paulson*, 2008 U.S. Dist. LEXIS 201, *12 (D.D.C. 2008) ("A plaintiff may [] proceed on a claim that was not administratively raised below if the new claim is 'like or related to' a previously filed claim.") (citing *Wiley v. Glassman*, 511 F.3d 151 (D.C. Cir. 2007)).

### 2.     Claims II & III: Reasonable Accommodations & Discrimination

In claim II of his complaint, Dage alleged he was denied four reasonable accommodations: reliable telecommunications equipment, portable work, adequate computer equipment and office supplies, and a mobility scooter. *See* Compl. ¶¶ 63, 77-80, 81-83, 85.  In claim III, he alleged he was discriminated against when the EPA took away his substantive work, impeded his ability to apply for a promotion, and suggested he was not disabled. *Id*. ¶¶ 58-59, 70-75, 84.  The defendant sought dismissal of claims II and III on the ground that they contained allegations that were not contained in or reasonably related to Dage's EEO complaint.  It filed a copy of Dage's EEO complaint in support of that position, and argued that Dage's administrative complaint was "limited . . . to the EPA's implementation of the 1999 AWS policy" and that he "never complained of or otherwise described discriminatory conduct outside of the 1999 AWS policy."  Def.'s Reply Br. at 12.  Dage countered, with few specifics, that his post-1999 allegations were reasonably related to the allegations in his administrative complaint.  *See* Pl.'s Opp'n at 18-19.

Defendant has the better of this argument.  Claims II and III contain post-1999 allegations that were not contained in, and are not reasonably related to, the claims in the administrative

complaint and were therefore not properly exhausted.  An examination of Dage's EEO complaint and accompanying affidavits demonstrates that his federal action is much broader than his administrative charge.

After pursuing informal counseling, Dage filed a formal EEO complaint with the EPA on September 2, 1999.  His EEO complaint focused almost exclusively on the EPA's adoption of the 1999 AWS policy.  In describing the particulars of his charge, for example, Dage explained that the new policy was retaliatory because it targeted Dage and other AWS employees who were injured at Waterside Mall and voiced their objections to the new policy.  *See* EEO Compl. ¶¶ 3, 13.  He was concerned that the new policy would have a "disparate impact" on employees, like himself, who were injured at the EPA headquarters building.  *Id.* ¶ 11.  Specifically, Dage noted that under the new policy AWS employees would have to submit a recertification application every two years to remain enrolled in the program.  *Id.* ¶ 16.  Employees who were not in the AWS program, by contrast, did not share this burden.  *Id.* ¶ 13.  Dage was also concerned that the new AWS policy would be "used to screen out or tend to screen out" disabled employees.  *Id.* ¶ 13.  Thus, reading Dage's EEO complaint in its entirety it is difficult to interpret it as anything other than a focused attack on the EPA's adoption and implementation of the 1999 AWS policy.  Indeed, this is precisely how the EPA interpreted the complaint when it accepted it for processing and investigation.  *See* Def.'s Mot., Ex. 2 (July 30, 2001 Letter from the EPA Office of Civil Rights).[10]

---

[10]  As best the Court can tell, Dage's principal grievance in his EEO complaint was not that the EPA had failed to provide him with the reasonable accommodations he needed to perform his job.  Rather, Dage was dismayed by the way in which the EPA provided these accommodations.  He was both frustrated that the EPA would not recognize his disability under the Rehabilitation Act and worried, as a result, that it would one day stop providing him an

Although Dage used the buzzwords "reasonable accommodations" in his EEO complaint, his focus at the administrative stage was much different than it has been in federal court.  In his EEO complaint, Dage was concerned he might lose AWS status due to the recertification application that he had to submit every two years, and that he would, as a consequence, lose his AWS workspace. EEO Compl. ¶ 4 (noting the re-certification requirement "threatened . . . [to remove his] reasonable accommodation arrangements").  Dage did not assert, by contrast, that the EPA had denied him any specific accommodation request, as he now does here.  Despite using the term, then, Dage was not raising an actual claim that he was denied a reasonable accommodation.  Rather, he feared that he might lose his status as an AWS employee if he did not properly submit his re-certification materials every two years, which would force him, he believed, to return to a non-AWS workspace that was not suitable given his disability.  *See* November 7, 2001 Affidavit of Elbert Leroy Dage at ¶ 30 ("Based on the [1999] AWS policy, I have been threatened with loss of my reasonable accommodations if I do not comply strictly with the recertification requirements.").

Dage's judicial complaint, by contrast, alleges the EPA denied him four specific, discrete accommodation requests that he needed in order to perform his job, *e.g.*, a mobility scooter, and that the EPA had engaged in three discrete acts of discrimination, *e.g.*, loss of professional work.  These

---

alternative workspace.  *See* November 7, 2001 Elbert Leroy Dage Rebuttal Affidavit at ¶ 3 ("This is exactly the central point of my Complaint.  I have requested reasonable accommodations under the Rehabilitation Act.  Instead of recognizing my disabilities and my legal rights under the Act to reasonable accommodations, EPA has decided to allow me to use AWS as a matter of its alleged beneficence.  As a result, EPA is, in effect, claiming the right to deny me reasonable accommodations whenever it chooses.").  Although the Court sympathizes with Dage's position, he has not shown that this policy, even if it felt more burdensome than its predecessor, constituted a violation of the Rehabilitation Act.

allegations are not related to the claims in his administrative complaint, which focus on the new 1999 AWS policy.  The most that can be said from reading Dage's EEO complaint is that he felt threatened he would lose his status as an AWS employee as a result of the new policy.  *See* EEO Compl., Introduction ("I have been receiving accommodations through the Alternative Workspace (AWS) policy here at EPA since August 1991. . . . I need to continue working in suitable AWS as part of my reasonable accommodations.) (emphasis added).  Because Dage did not allege he had been denied actual accommodations or that he was discriminated against outside of the new policy, it cannot be said that the claims in his judicial complaint are reasonably related to his EEO complaint.  An investigation following his EEO charge could not reasonably have been expected to uncover Dage's post-1999 claims – they are all very different, and involve different actors and different types of discrimination, from his focus at the administrative level, and they do not arise from the implementation of the new AWS policy.  Moreover, as Dage candidly admits, he was never removed from the AWS program and, indeed, he was later granted leave to work from home under the 1999 AWS policy due to an increase in the severity of his symptoms.  Compl. ¶ 38.  His fear that he would lose AWS protections was, it turns out, unfounded.

The Court finds additional support for the conclusion that Dage's EEO complaint does not encompass his post-1999 claims in Dage's own affidavit.  *See* November 7, 2001 Affidavit of Elbert Leroy Dage.  Dage never suggested in his affidavit that the EPA had denied him specific accommodations; indeed, he took the opposite position, asserting that he had consistently received reasonable accommodations since 1991.  *See id.* at ¶ 1 ("I have been receiving reasonable accommodations of various kinds, including being assigned to work in the "Alternative Work Space"

. . . since August 1991."); ¶¶ 16, 20 (listing reasonable accommodations Dage routinely received since enrolling in the AWS program). Notably, in direct contradiction of his complaint in this Court, where Dage claims he was denied adequate telecommunications equipment, Dage stated that the EPA had "routinely provided [him] with [a] reasonable accommodation by allowing [him] to attend meetings by teleconference." *Id.* ¶ 27; *accord id.* ¶ 22(g) (noting Dage had routinely been allowed to attend work-relating meetings and seminars by teleconference). Dage asserted, moreover, that he continued to receive reasonable accommodations under the new 1999 AWS policy, just as he had under the earlier policy. *Id.* ¶ 29 ("I reapplied for AWS under the new February 1999 policy in 1999 and 2001. <u>On all occasions, my requests for AWS have been approved</u>.") (emphasis added); *accord id.* ¶ 29 ("Following the approval of my 1999 Alternative Work Space re-certification package, <u>I was allowed to continue receiving reasonable accommodations for my disability for two years</u>."); Pl.'s Stmt. of Facts ¶ 1 ("It is correct that accommodations ha[ve] been provided" "through the Alternative Workspace (AWS) policy in effect since 1989.").

Dage nonetheless contends now that the claims in his judicial complaint are reasonably related to the claims in his EEO complaint because he alleged, in his EEO complaint, that "the 1999 AWS policy denied [him] his rights as a disabled employee under the Rehabilitation Act." Pl.'s Mot. at 15. Each accommodation request he was subsequently denied, he reasons, was therefore "directly connected to the AWS policy by denying [him] the rights afforded by the Rehabilitation Act." *Id*. But his argument is not convincing. Dage seems to suggest that because he challenged the 1999 AWS policy at the administrative level he is subsequently free, in federal court, to challenge any accommodation he was later allegedly denied. And yet, as Dage himself claims in his federal court

complaint, the new AWS policy is not the means by which the EPA provides reasonable accommodations to its employees. *See* Compl. ¶ 47 (noting that under the new AWS policy the "EPA took the position that reasonable accommodations under the Rehabilitation Act and reasonable accommodations under the AWS policy are separate"). The 1999 AWS policy is much more narrow in focus and is used for assigning alternative workspace to EPA employees injured at Waterside Mall. Thus, it is not clear to the Court why Dage should be able to challenge any reasonable accommodation he claims to have been denied at any point after the new policy went into effect. This would render the "like or reasonably related" test so broad as to be meaningless.

### 3.    Claim IV: Retaliation

In claim IV, Dage alleged the EPA retaliated against him when it, *inter alia*, took away his professional work for 17 months and denied him the ability to compete for promotion. Defendant sought dismissal of claim IV, as it had with claims II and III, for failure to exhaust because the claim asserted post-1999 allegations that were not contained in or reasonably related to Dage's EEO complaint. In his motion for reconsideration, Dage counters that his allegations in claim IV were encompassed within his administrative complaint, and even if they were not, "there is substantial authority that acts of retaliation occurring after the filing of an administrative complaint can be included in a judicial complaint without the need to file a new administrative complaint." Pl.'s Mot. at 22. Pointing to the recent decision in *Hazel v. Washington Metro. Area Transit Auth.*, 2006 U.S. Dist. LEXIS 89139 (D.D.C. 2006), Dage argues that his judicial complaint should be interpreted to be as broad as the scope of any investigation that reasonably could have been expected to result from his EEO complaint. *Id*. at 26. He did not need to file a new administrative complaint, he reasons,

because "the investigation of [his] administrative complaint could be expected to [un]cover the subsequent acts of retaliation." *Id*. at 27. The Court disagrees.

In this case, even under the generous reasonable-relatedness standard Dage advocates, the Court does not have jurisdiction to review his post-1999 claims. As noted above, Dage's EEO complaint was focused on the EPA's implementation and application of the 1999 AWS policy. In particular, Dage claimed that the EPA's application of the new policy was a retaliatory act aimed at Dage and the other AWS employees who had voiced their objections to the new policy. *See* EEO Compl. ¶ 3. His post-1999 allegations, however, are of a completely different ilk. They introduce new actors (Ms. Seed) and new discrete acts (loss of work) that were never raised at the administrative level. *See Carroll v. England*, 321 F. Supp. 2d 58, 66 (D.D.C. 2004) (holding a Title VII claim is "like or reasonably related to the allegations of the [EEO] charge" if it "'describe[s] the *same conduct* and implicate[s] the *same individuals*" (quoting *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1117 (7th Cir. 2001)); *Cheek v. Western & S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994) ("[C]laims are not alike or reasonably related unless there is a factual relationship between them.").

Consider, for example, Dage's claim that his supervisor, Ms. Seed, took all professional work away from him for a 17-month period until he agreed to move out of his AWS workspace. Not only is this claim totally absent from Dage's EEO complaint, but it does not bear any factual relationship to claims he did raise in his EEO complaint. Dage never suggested he had been singled out by his supervisors or that his job responsibilities had changed after he opposed the new AWS policy. This allegation even contradicts his 2001 rebuttal affidavit, where Dage stated:

> It is important to emphasize that <u>I do not claim that I was discriminated against as an individual employee</u>. My claim is that I was discriminated against together with all the other EPA employees who were disabled as a result of the conditions at Waterside Mall.

*See* November 7, 2001 Elbert Leroy Dage Rebuttal Affidavit at ¶ 4.  Given the factual differences between his administrative claim challenging the adoption and implementation of the 1999 AWS policy and the retaliation asserted in claim IV, the Court cannot find that they are reasonably related or that an investigation of his EEO complaint would have uncovered these subsequent alleged acts of retaliation.  Those claims therefore were not exhausted administratively.

### C.    Conclusion

The decision in January 2007 to enter judgment against Dage on claims II, III and IV regarding his post-1999 allegations was correct because Dage failed to administratively exhaust these allegations and because there was no record evidence to support them.  Hence, Dage's motion for reconsideration must be denied as to those claims.

### II.    The 1999 AWS Policy[11]

After recognizing Dage had properly exhausted his administrative remedies for claims based on the 1999 AWS policy, the Court nonetheless dismissed claims III and IV because the policy did not constitute an actionable adverse employment action, which is a required element for both discrimination and retaliation claims under Title VII and the Rehabilitation Act.  *See Czekalski*, 475 F.3d at 363; *Brown*, 199 F.3d at 452.  Dage challenges two aspects of that analysis.  First, he argues

---

[11]   Dage has exhausted his administrative remedies with respect to claims III and IV regarding the EPA's implementation of the 1999 AWS policy, which the Court therefore addresses on the merits.

that the Court committed clear error by failing to address his allegation that the 1999 AWS policy seriously harmed his health.  Second, Dage argues that the Court should reconsider its decision due to an intervening change in controlling law that altered the legal standard for retaliation claims, namely, the Supreme Court's opinion in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

### A.   Legal Standard: Adverse Employment Action

As noted, Dage must show that he suffered an adverse employment action to establish a *prima facie* case of discrimination or retaliation.  "Adverse employment actions are not confined to hirings, firings, promotions, or other discrete incidents."  *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (citing *Cones v. Shalala*, 199 F.3d 512 , 521 (D.C. Cir. 2000)).  Rather, "[a]n employment action may be sufficient to support a claim of discrimination if it results in 'materially adverse consequences affecting . . . future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'"  *Wiley*, 2007 U.S. App. LEXIS 28880 at *11 (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002)); *see also Sewell v. Chao*, 2008 U.S. Dist. LEXIS 7069, at *20 (D.D.C. 2008) ("Following the Supreme Court's decision in [*Burlington Northern*], it appears that '[a]n adverse action in the retaliation context may involve something short of what ordinarily would be considered a "personnel action" (e.g., denial of promotion, discharge, salary reduction) . . . .'" (quoting *Rattigan*, 503 F. Supp. 2d at 75).  Still, "not everything that makes an employee unhappy is an actionable adverse action."  *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001).

### B.   Claim III Discrimination & Claim IV Retaliation: Stress and Fear

Dage contends that the Court committed clear error when it failed to consider whether the 1999 AWS policy's recertification requirement constituted an adverse employment action because it subjected him to the "stress and fear" that he would be removed from the AWS program.  *See* Compl. ¶ 52 ("The requirement to submit a new application and new medical documentation for AWS subjected plaintiff to the stress and fear of potential removal of his accommodations and thereby termination from his job and career.").[12]  Defendant counters that irrespective of how stifling Dage's stress and fear may have felt, a subjective fear of future employment action – especially one that never happens – does not create a triable issue of fact.  Defendant has the better argument here as well.

Although Dage is correct that the January 2007 opinion failed to address this issue, this oversight does not lead the Court to alter the earlier judgment.  As defendant notes, and Dage concedes, Dage was never actually removed from the AWS program.  His anxiety, while perhaps understandable given his delicate health condition, was speculative, subjective, and ultimately unfounded.  Purely subjective harm of this nature does not represent an actionable adverse action. *See, e.g.*, *Forkkio*, 306 F.3d at 1130-31 ("Purely subjective injuries, such as dissatisfaction with a reassignment, or public humiliation or loss of reputation, are not adverse actions.") (citations omitted); *Dickerson v. Sectek, Inc.*, 238 F. Supp. 2d 66, 75 (D.D.C. 2002) (no adverse action in

---

[12]  *See also* Compl. ¶ 56 ("The re-application requirements of the 1999 AWS Policy created a constant high level of stress and fear for plaintiff.  If removed from AWS, plaintiff would have been forced to return to work in EPA's Waterside Mall offices where he would have been placed at risk of life-threatening allergic reactions and anaphylaxis or be terminated from employment. . . . The stress and fear of termination of employment was unbearable to plaintiff, affecting all aspects of his life, including plaintiff's relationships with supervisors, co-workers, friends and family, and plaintiff's ability to maintain his health.").

gender discrimination case where "[plaintiff's] only harm, if any, was physiological -- the stress that she endured when faced with the prospect of losing her position"); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) (holding that "the decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action").

In essence, Dage claims he was discriminated against because of the subjective anxiety he felt due to his fear, unfounded as it turned out, that the EPA might deny him a reasonable accommodation in the future. But there are two hurdles that Dage failed to overcome. First, he needed to direct the Court to case law interpreting the term "adverse personnel action" broadly enough to encompass subjective fear of future harm. He never did. Second, Dage needed to explain how the EPA could be liable under the federal anti-discrimination laws where the agency had consistently provided Dage with the specific accommodation he was afraid of losing. He never did that either. To hold the EPA liable in this situation would be akin to punishing it for its success: the EPA did such a good job of providing Dage the AWS office space he needed for more than ten years that he became emotionally dependent on it and was understandably afraid of losing it, and hence could sue based on that fear. It would be strange, indeed, to penalize the EPA for consistently doing what it was supposed to do under the law.

### C.    Claim IV Retaliation: The 1999 AWS Policy

Dage asks the Court to reconsider its decision that the EPA's implementation of the 1999 AWS policy did not, as a matter of law, constitute an adverse employment action in a retaliation claim in light of the Supreme Court's decision in *Burlington Northern*. Although *Burlington*

*Northern* was issued before the January 2007 opinion was filed, the Court did not take it into consideration when addressing Dage's retaliation claim.  It does so now.[13]

In claim IV, Dage alleged that the EPA's adoption and implementation of the 1999 AWS policy was an act of retaliation because it only applied to employees, like himself, who were injured at Waterside Mall and who sent a letter to the EPA Administrator on January 2, 1999 – before the EPA formally adopted the policy – requesting an opportunity to voice their "concerns" about the policy.  Compl. ¶¶ 49, 52, 54-57, 105; *see also* EEO Compl. ¶¶ 3, 11-13.  The EPA Administrator implemented the policy on February 1, 1999, without meeting to discuss Dage's concerns.  Under the new policy, Dage was required to complete a recertification application every two years to remain in the AWS program, which required him to consult a physician.  Dage argued that having to consult a physician forced him to use sick leave and cost him unspecified medical expenses.

In the January 2007 opinion, the Court concluded Dage's claim lacked merit because he failed to show that the policy's recertification requirement constituted a materially adverse action for the purpose of establishing a *prima facie* case of retaliation.  The Court reasoned that requiring Dage to consult a physician once every two years to remain in the AWS program was not a tangible change in his duties or working conditions because Dage was regularly visiting his physician before

---

[13]  Dage does not claim the 1999 AWS policy violates the ADA's prohibition against inquiries into the disabilities of a current employee, neither party has briefed that issue, and the Court therefore does not address it.  *See* 42 U.S.C. § 12112(d)(4)(A) ("A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.").

the new policy was implemented.  The Court observed that Dage's physician seemed to agree the recertification requirement was a good idea; should Dage's condition worsen, the recertification process would ensure that he was assigned a suitable workspace.  In short, the Court believed that the recertification requirement would ultimately protect Dage, not harm him.  The accompanying medical visits, while perhaps a nuisance in Dage's view, were necessary.

Following the Supreme Court's decision in *Burlington Northern*, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern*, 126 S. Ct. at 2415 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (other citation and internal quotation marks omitted); *see also Velikonja v. Gonzales*, 466 F.3d 122, 124 (D.C. Cir. 2006) ("[T]he Supreme Court held [in *Burlington Northern*] that a Title VII plaintiff need not allege an adverse employment action to state a claim for retaliation, but rather must show that the employer's actions are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'") (per curiam).  Dage does not satisfy this modified standard.

The requirement that Dage submit a renewal application every two years does not constitute an action that a reasonable employee would find materially adverse.  *Burlington Northern*, 126 S. Ct. at 2415 ("We speak of material adversity because we believe it is important to separate significant from trivial harms.").  Dage does not allege that the recertification requirement affected his pay, benefits, job title, responsibilities, or work hours.  His primary complaint is that the recertification process is overly burdensome because he must use sick leave and incur medical costs

34

to see a physician to secure the medical documentation required by the EPA.  Compl. ¶¶ 52, 68.
These are practical concerns.  He is bothered that he has to use his own time and his own money to
meet a requirement the EPA had not, until 1999 at least, ever required.  Dage undoubtedly questions
the need for this new requirement given that the prior AWS program had been in place for ten years
before this requirement was added through the 1999 AWS program.

Although the Court can see how Dage might view the recertification process as a nuisance,
a reasonable employee in this position would not have found the challenged action materially
adverse, for two reasons.  First, the new policy did not actually burden Dage.  Given the severity of
his symptoms, Dage was already consulting his physician on a regular basis.  Because he was
periodically consulting with his doctor before the new policy went into effect, it is not clear how the
policy actually burdened him, if at all.  *See* Compl. ¶ 60 (noting Dage would continue to "need []
periodic reviews with his doctor based on his symptoms").  Indeed, Dage sought a similar
certification from his physician in 2002 to receive a special EPA parking pass, apparently without
complaint.  *Id*. ¶ 65.  If there was any added burden on him, in other words, it would have been
slight, and certainly not such that a reasonable employee would find materially adverse.  Second, the
new policy would help protect Dage.  Although Dage asserts that his condition is permanent and will
not improve, his doctor noted that his condition might yet worsen.  In fact, in 2001 Dage's condition
did worsen.  In his recertification application, Dage's physician noted that Dage had experienced "an
overall increase in the frequency, severity and variety of [his] allergy symptoms."  *Id*. ¶ 55.  The
physician explained that Dage's accommodations were appropriate, for the time being, "unless [he]
experienced significant symptoms which required additional measures."  *Id*.  The mandatory

35

recertification process would, in short, help ensure that Dage was placed in the appropriate workspace, so that his workspace could change if his needs did.  His physician even seemed to agree the new policy was "sufficient" to protect Dage.  *See* Pl.'s Opp'n, Ex. 11 ("The two-year re-certification period specified by EPA policy for the Alternative Work Space program is sufficient.").  The fact that Dage was eventually relocated to work from home when his symptoms worsened in 2003 further supports the notion that the policy helped protect Dage.  *See* Compl. ¶ 38 (Dage reassigned to work from home in February 2003 "because of respiratory problems [he] experience[d] while commuting to work").

Given that Dage was already periodically consulting his physician and that the new policy would help ensure he was continually receiving the proper workplace assignment, the Court concludes that the recertification requirement in the 1999 AWS policy does not amount to a materially adverse action.  Moreover, the Court has serious doubts that requiring Dage to complete this application every two years could, by itself, amount to a materially adverse action even after *Burlington Northern*.  Actionable retaliation claims are, after all, limited to those situations where an employer causes "material adversity," not "trivial harms."  *Burlington Northern*, 126 S. Ct. at 2415.  Although having to complete the renewal application every other year may be more than a trivial task, it is hardly, in this context, a material harm.

Finally, even assuming that the recertification requirement amounted to an adverse employment action after *Burlington Northern*, Dage has failed to show that the EPA's implementation of the new AWS policy is causally connected to his allegedly protected activity.  *Brown*, 199 F.3d at 452.  According to the complaint, the EPA proposed modifying the existing

AWS policy long <u>before</u> Dage contacted the EPA Administrator to protest the policy.  Thus, it was not Dage's complaint that caused the EPA to implement the new policy at all.  The genesis of the policy, as Dage explained in his rebuttal affidavit, can be traced to an audit prepared by the U.S. Government Accountability Office (GAO) in 1992 and 1993, which was conducted in response to congressional concerns that the EPA was mistreating AWS employees.  According to Dage, the GAO found the "EPA had failed to meet [its] responsibility to enforce the original 'Alternative Workspace Policy' by failing to maintain accurate files, <u>including medical documentation</u>, for all employees assigned to AWS."  Dage Rebuttal Aff. ¶ 2 (emphasis added).  The GAO thus "mandated that [the EPA] clean up [its] records and provide an account of the employees [in the program]." *Id*.  The EPA's formulation – and subsequent implementation and application – of the new AWS policy, then, was not done in response to Dage's vocal concerns.  Instead, the EPA was responding to a specific mandate by the GAO.  Accordingly, the requisite causal link for a prima facie retaliation claim is missing.

In conclusion, because Dage has failed to allege "enough facts to state a claim for relief that is plausible on its face," claims III and IV based on the 1999 AWS policy were properly dismissed. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007).  The Supreme Court's decision in *Burlington Northern*, admittedly a development in controlling law, does not change this result.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for reconsideration is denied.  A separate Order accompanies this Memorandum Opinion.

  /s/   John D. Bates

**JOHN D. BATES**

**United States District Judge**

**Dated**:  February 27, 2008